UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KAREN T. and ROBERT T., SR. for
themselves and their minor daughter, N.T.

                Plaintiffs,

      v.

ERIN DEVENEY, Interim Commissioner of
the DEPARTMENT OF CHILDREN &
FAMILIES, and MARTHA COAKLEY, the
Attorney General of the Commonwealth of
Massachusetts.

                Defendants.

Civil Action No. 1:14-cv-12307-MLW

---

**MEMORANDUM OF LAW IN SUPPORT OF
STATE DEFENDANTS' MOTION TO DISMISS**

---

MARTHA COAKLEY
ATTORNEY GENERAL

Robert L. Quinan, BBO No.  553010
Robert.quinan@state.ma.us
Suleyken D. Walker, BBO No. 654933
Suleyken.walker@state.ma.us
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2981 (Walker)

Defendants Erin Deveney, Interim Commissioner of the Massachusetts Department of Children and Families ("the Department"), and Martha Coakley, Attorney General for the Commonwealth of Massachusetts, submit the following memorandum in support of their motion to dismiss plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## INTRODUCTION

This case arises out of the Department's investigation of allegations of medical neglect by plaintiffs of their child, N.T., and the Department's subsequent determination to close the matter following its investigation.  Plaintiffs allege that the Department's conduct has "chill[ed] their efforts to seek appropriate and effective medical care for their Daughter," and thereby has interfered with their constitutional right "to make decisions concerning the care, custody, and control of their children."  Compl., ¶¶ 84, 85.  In Count I, plaintiffs seek a declaration that the Department "cannot, consistent with the Due Process Clause of the Fourteenth Amendment . . . base any government action against Mother and Father on their continued belief that their Daughter's difficulties are due to medical causes . . . including but not limited to PANDAS or Auto-Immune Encephalitis, or because they continue to consult with and seek care for their Daughter from multiple doctors or specialists in different facilities."  Compl., ¶ 88.  Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

The Supreme Court has recognized a constitutional right to "family integrity," *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993), and a recognized "subset of that right [is] the parental interest in the care, custody and control of children."  *Hatch v. Dept. of Children, Youth and Their Families*, 274 F.3d 12, 20 (1st Cir. 2001).  However, this constitutional right is not unlimited or unconditional.  *Watterson*, 987 F.2d at 8.  The parents' right to the care, custody and control of their child does not provide an unfettered right to make medical decisions which

jeopardize the child's psychological and/or physical well-being.  *Parham v. J. R.*, 442 U.S. 584, 603 (1979) ("a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized").  Plaintiffs are therefore not entitled to a declaration which would, in effect, enjoin the Department from asserting the interest of the Commonwealth in protecting N.T. from abuse or neglect if the plaintiffs' decisions concerning her medical care jeopardize N.T.'s physical or mental health.

Moreover, although declaratory relief is available where the alleged injury is a chilling of an individual's ability to exercise a constitutional right, to establish standing for declaratory relief under 42 U.S.C. § 1983, a plaintiff must allege more than a subjective fear that the state actor will respond in a manner which infringes upon a constitutional right.  *Blum v. Holder*, 74 F.3d 790, 797 (1st Cir. 2014).  Plaintiffs must allege facts which, if proven, demonstrate that a deprivation of their constitutional right by the Department is *certainly impending*.  *Id.*  Because plaintiffs have failed to allege facts which establish a certainly impending deprivation of a constitutional right, they have no standing to seek declaratory relief and the complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

In Count II of the Complaint, plaintiffs allege that the Department unconstitutionally exceeded its statutory authority by failing to define "medical neglect" and taking "adverse actions" against them without a finding that they have abused or neglected N.T.  Compl., ¶ 96. This Count too must be dismissed.  First, plaintiffs essentially seek a declaration that their allegation about these past events is correct.  Plaintiffs are therefore presenting this court with a controversy that is no longer "live" and Article III requires dismissal of Count II as moot.  *Am. Civil Liberties Union of Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013).  Second, because Count II seeks relief that is retrospective in nature, it is barred

by the Eleventh Amendment and the doctrine of sovereign immunity.  *Rosie D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002).

Finally, the plaintiffs have named the Attorney General as a defendant in this lawsuit. However, the complaint is otherwise devoid of any reference whatsoever to the Attorney General.  Thus, plaintiffs have failed to state any claim against the Attorney General and she should be dismissed from this case pursuant to Fed. R. Civ. P. 12(b)(6).

## FACTUAL BACKGROUND

Plaintiffs' twenty page complaint includes only nine paragraphs that allege, with any particularity, facts concerning the Department's interactions with the plaintiffs.  The allegations in those paragraphs, supplemented by the Department's G.L. c. 119, § 51A reports and § 51B investigation reports,[1] establish the following background in this case:

On June 22, 2012, pursuant to G.L. c. 119, § 51A, a mandated reporter filed a report of suspected child abuse or neglect with the Department.[2]  The reporter expressed concern for the health and well-being of N.T., a child hospitalized at Children's Hospital in Boston Massachusetts.  Complaint ("Compl."), ¶ 60; Exhibit A, § 51A Report (June 22, 2012), p. 3. N.T. is the plaintiffs' child and had been very ill since at least September of 2011.  Compl. ¶ 24. Health care providers disagreed with one another over the proper diagnosis, but the gravity of the

---

[1] "[I]t is well-established that in reviewing the complaint, [this Court] 'may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.'" *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000), (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).  Plaintiffs repeatedly referenced the Department's reports and they are integral to the complaint.  Therefore, this Court may properly consider them.

[2] If a mandated reporter, as defined in G.L. c. 119, § 21, has reasonable cause to believe  a child is suffering physical or emotional injury resulting from abuse or neglect he or she must file a written report with the department detailing the suspected abuse or neglect.  G.L. c. 119, § 51A.

child's illness was beyond dispute.  Compl., ¶¶ 24-29, 38-52.  In late May of 2012, plaintiffs brought N.T. to Children's Hospital "because of a refusal to eat because of pain."  Compl., ¶ 38. The physicians at Children's Hospital believed there was a psychiatric component to N.T.'s condition and, according to the reporter, N.T.'s parents disagreed.  Exhibit A, p. 3.  The reporter opined that the child should be admitted to the hospital's inpatient psychiatric unit known as "Bader 5," and asked the Department to intervene.  *Id.* at p. 4; Compl. ¶ 60.

As required by law when the Department receives a report alleging abuse or neglect of a child which is not screened out[3], the Department assigned a social worker ("the investigator") to investigate the report in accordance with G.L. c. 119, § 51B (hereinafter "§51B investigation"). *See*, *generally,* Exhibit B, § 51B Report (June 22, 2012).  *See also*, G.L. c. 119, § 51B. *Frazier v. Bailey*, 957 F.2d 920, 923 (1st Cir. 1992).  However, before the investigator had an opportunity to speak with N.T.'s parents, she learned that they had agreed to admit the child to Bader 5. Exhibit B, p. 2-3; Compl. ¶ 47.  The investigator nonetheless proceeded with the § 51B investigation in accordance with the Department's procedures and state law.

During the course of the § 51B investigation the worker spoke with the plaintiffs, as well as several of N.T.'s health care providers.  *See*, *generally*, Exhibit B.  On July 13, 2012, the social worker concluded the following:

> It is this worker's opinion that the family does not appear to have been neglectful in any way over the past year.  It appears the family has done everything in their power to try and find the right diagnosis and treatment for their daughter, to the point where they obtained consultations with doctors outside of the state[.] . . .[I]t should be noted that Children's Hospital has expressed concern that Mr. and Mrs. T. do not agree that N.'s condition is completely psychiatric in nature.  I feel that the family is entitled to their opinion as long as they are not placing their daughter at risk as a result of it[.] . . . There does not appear to be any need for further DCF involvement at this time.

---

[3] Some § 51A reports are "screened out" and, therefore, are not assigned to an investigator for a § 51B investigation.  110 CMR 4.21.

Exhibit B, p. 13. Thus, the Department had no concerns as a result of the plaintiffs' disagreement with Children's Hospital's diagnosis. The outcome of the investigation was to unsupport the allegations and close the case. *Id.* at p. 14.[4] Children's Hospital discharged N.T. on July 13, 2012, and she returned to the plaintiffs' home. Exhibit C, § 51A Report (September 17, 2012), p. 3. Plaintiffs have not alleged that she has since been removed from their care.

Two months later, on September 17, 2012, a second mandated reporter filed a § 51A report concerning N.T.'s care. Exhibit C, p. 3. The reporter expressed concern that N.T.'s parents were not following up on Children's Hospital's referral to a psychiatrist so that N.T. could obtain an assessment and treatment plan. *Id.,* at p. 3. The reporter stated that he had communicated with N.T.'s primary care provider, who had informed him that the parents were seeking treatment for PANDAS (Pediatric Autoimmune Neuropsychiatric Disorder Associated with Streptococcal Infection). Compl., ¶¶ 1, 29-33; Exhibit C, p. 3. The reporter objected to this diagnosis. Exhibit C, p. 3. The § 51A screening notes reflect the reporter's belief that there was a major psychiatric component with N.T.'s difficulties and the reporter's disagreement with the parents that PANDAS was the cause of N.T's difficulties. *Id.* at p. 3. The Department assigned a social worker to conduct a second § 51B investigation. Exhibit D, § 51B Report (September 19, 2012).

The investigator began by speaking with the plaintiffs, the reporter, and N.T.'s primary care provider. Exhibit D, p. 1-3. The § 51B report indicates that Children's Hospital staff and

---

[4] In paragraph 62 of the Complaint plaintiffs state that, on July 16, 2012, the Department found minimal concern "specifically because the Mother and Father 'agreed to comply with Children's Hospital recommendation to allow [the Daughter] to be admitted to Bader 5.'" No such statement appears in the investigator's conclusions or anywhere in the report and it is entirely at odds with the sequence of events. In considering a motion to dismiss, the facts reflected in a document may "trump the complaint's allegations if a conflict exists." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 n. 3 (1st Cir. 2012).

the plaintiffs continued to disagree about the proper diagnosis and appropriate treatment for N.T.

*Id.* at p. 2-3.  Notably, N.T.'s primary care provider took no position with respect to whether

N.T. had PANDAS or, as Children's Hospital believed, suffered from a strictly psychiatric

condition.  The primary care provider did express concern that N.T.'s mother "appeared to

doctor shop until she finds someone to do whatever procedures she feels necessary. . . . [and that]

there appears to be a real disconnect with regards to all of the current treatment providers at

Mass. General [Hospital]."  The provider informed the worker that she believed N.T. should

receive some psychiatric care, "even if there is underlying medical issues [because the child had]

a significant amount of anxiety." *Id.*, p. 3.  She further stated that she was most concerned with

the plaintiffs' decision to have N.T.'s tonsils removed due to possible side effects, infections and

pain when it may not be necessary.  *Id.*, p. 3.

On September 21, 2012, the investigator met with the plaintiffs in their home.  The

plaintiffs provided the worker with a comprehensive summary of the status of N.T.'s health and

medical care and their position with respect to her needs.  <u>Exhibit D</u> at p. 4-5.  The investigator

explained that the physicians did not all agree that certain medical procedures were necessary

and this was therefore of concern to the Department.  The worker also explained that family

therapy was "extremely important" under the circumstances and offered the assistance of

MassHealth so that such therapy would be affordable.  According to the § 51B report, the

plaintiffs agreed "that family therapy is necessary and there [was] a mental health piece to N.T.'s

condition." *Id.,* p. 5.

During the remaining course of the second § 51B investigation, the worker interviewed

N.T.'s psychiatric nurse, her immunologists, gastrointestinal physician, pediatric infectious

disease physicians, PANDAS specialists, guidance counselors, visiting nurses, and the

Department's nurse and consulting physicians.  *Id.,* p. 6-16.  On October 9, 2012, upon completion of the investigation, the investigator noted that while four doctors diagnosed N.T. with PANDAS, a majority of the doctors believed there was some psychiatric component to her health problems.  *Id.*  The absence of any mental health treatment and rehabilitation to regain lost milestones was therefore a source of concern.  *Id.*  The investigator recommended a more comprehensive forty-five day assessment before deciding whether to close the case. *Id.*

On October 9, 2012, the investigator also spoke with N.T.'s mother to explain the status of the investigation.  Exhibit D, p. 16.  The investigator informed N.T.'s mother that she was "not going to choose a position or say whether [N.T's] symptoms were due to medical or psychiatric causes, but rather [that the Department] just wanted to try and prevent [N.T.] from further deterioration."  *Id.*  For that reason, the investigator informed the mother that the Department's clinical team believed "intensive pediatric rehabilitation" would help N.T. regain some of her lost developmental milestones.  *Id.*

At the close of the § 51B investigation, the Department adopted the investigator's recommendation and assigned the case for a comprehensive assessment.  Exhibit E, Assessment Worksheet (October 9, 2012).  According to the summary of the comprehensive assessment, N.T. "had made improvements in her functioning over the past two months" and the plaintiffs had "displayed strong coping skills in times of stress."  *Id.*, p. 9.   The investigator noted that, due to the complexity of the case and the parents' desire to have the case closed, she had consulted with the Department's nurse and consulting pediatric psychiatrist.  *Id.* p. 10.  The team concluded that N.T. was not at imminent risk and if her parents identified a new pediatrician to oversee her care, and the Department "could verify that the two PANDAS specialists . . . were working together in treating N.T.," and that there was some form of emergency plan for medical

7

intervention should N.T.'s condition deteriorate, then the Department could close the case.  *Id.*, p. 10.  Plaintiffs identified a new pediatrician and signed releases so that the investigator could verify the necessary information.  *Id.,* p. 9.  The investigator confirmed that the two PANDAS specialists treating N.T were in agreement that she had PANDAS, "and they will maintain communication with each other and the pediatrician regarding her treatment plan." *Id.,* p. 10.  On November 19, 2012, the Department closed the case, finding no support for the § 51A report of neglect.  *Id.,* p. 9.

Nearly a year later, on September 4, 2013, the Department received a third § 51A report from an anonymous source.[5]  The reporter expressed concern to the Department that N.T. and her mother were "completely enmeshed," and that the mother is "resistant to therapeutic intervention that prevents [N.T] from having any impactful therapy because she coaches [N.T.] on what to say."  Exhibit F, § 51A Report (September 4, 2013), p. 3-4.  The reporter stated that the "lack of appropriate treatment is causing [N.T.'s] continued physical, emotional and developmental deterioration."  *Id.*, p. 4.  The Department screened in the report and opened the case for a § 51B investigation.  *Id.*, p. 9.

The third § 51B investigation consisted of interviews with N.T.'s special education administrators, occupational therapists, physical therapists, special education teachers, as well as N.T.'s mother and numerous medical care providers.  Through her interviews, the investigator learned an extensive amount about N.T.'s physical and emotional condition, the services she was receiving, and the concerns of those who were involved with N.T.'s care.  *See, generally*, Exhibit G, § 51B Report (September 3, 2013).

The special education providers wished for more communication with the plaintiffs as

---

[5] Pursuant to 110 CMR 4.20, the Department accepts anonymous reports of abuse or neglect from non-mandated reporters.

well as an ability (through parental consent) to speak with N.T.'s physicians.  Exhibit G, p. 2.

The special education providers, as well as several other providers, believed N.T. needed a

psychological evaluation, but noted that "nothing had been done yet."  *Id.* p. 8-10.

From N.T.'s medical providers, the investigator learned that N.T. tested positive on a new

test for PANDAS and that Mass. General Hospital would be "starting a PANDAS Clinic soon

and [N.T. would] be one of their patients."  *Id.*, p. 4.  According to N.T.'s psychiatric nurse, the

child "had the worse [sic] case of PANDAS all of [the] doctors [had] seen."  *Id.,* p. 4.   PANDAS

specialists reported that it was a "complex case and they are still trying to figure out what is

going on."  *Id.,* p. 10.  N .T.'s pediatrician informed the worker that [N.T.] is "a very

complicated kid" and that the child sees a "nutritionist, an immunologist, and an infectious

disease doctor, [and] all send him updates of [N.T.'s] exams and they rarely have

recommendations."  Exhibit G, p. 8.  N.T.'s neurologist reported to the Department's nurse that

N.T. was making some progress but may be "resisting therapies as a result of [N.T.'s] high level

of anxiety[.]"  The doctor suggested it may be time to address the "psychological components of

this condition," but cautioned against moving too quickly.  She recommended a particular

psychiatrist from Massachusetts General Hospital who had expertise in the area of PANDAS, Dr.

G.  Exhibit G, p. 19.

From the plaintiffs, the investigator learned that N.T. received "weekly academic support,

speech and language, occupational and physical therapy in the home."  Exhibit G, p. 5.  The

plaintiffs informed the investigator that their goal was "to get [N.T.] back into school," Exhibit

G, p. 6-7, and they disputed that they had prevented providers from talking to each other.  *Id.*, p.

12.  The plaintiffs further expressed the hope that when the PANDAS clinic opened, N.T.'s care

would "be more centralized."  Exhibit G, p. 13.

On or about September 30, 2013, the worker set forth her conclusions and recommended that the case remain open for a comprehensive assessment to ensure that the plaintiffs followed through with their commitment to have a family therapy consultation and evaluation, and to address N.T.'s psychological needs through treatment with Dr. G., as suggested by N.T.'s neurologist.  Exhibit G, p. 21.  The Department assigned the case for further assessment on October 2, 2013.  Exhibit H, Assessment Worksheet (October 2, 2013).

During the course of the further assessment period, the plaintiffs learned that the cost of an initial consultation with Dr. G. would be $3,000.  Exhibit H, p. 9.  Therefore, plaintiffs arranged to have N.T. meet with a different psychiatrist on December 16, 2013.  *Id.*, p. 10.  The investigator made the following recommendation in her final report:

> It is my recommendation that the [N.T] case closes at the conclusion of the comprehensive assessment period . . . After some searching for providers by the family that were not promising, they received notification that [N.T] could be seen by Dr. K.W., a psychiatrist who will be largely involved in the opening of the PANS/PANDAS clinic at MGH. This appointment is scheduled for Monday, 12/16/13 at 9am (as confirmed by Dr. W., an immunologist through MGH). The children are visible in the community and at this time there are no current protective concerns.

Exhibit H, p. 15.  The Department then closed the case in December of 2013.  *Id.*

### ARGUMENT

**I.  ARTICLE III OF THE CONSTITUTION REQUIRES DISMISSAL OF COUNT I OF THE COMPLAINT BECAUSE THE FACTS ALLEGED, IF PROVEN, FAIL TO ESTABLISH A CASE OR CONTROVERSY NECESSARY TO ESTABLISH STANDING.**

"Article III [of the Constitution] restricts a federal court's jurisdiction to certain 'Cases' and 'Controversies.' . . . One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue."  *Blum*, 744 F.3d at 795 (internal quotation marks and citations omitted).  To establish Article III standing, a plaintiff must allege, *inter alia*, an injury which is "concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*,

133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted).

To support a claim where the alleged injury is "a threat of *future* injury . . . [p]laintiffs must show that the threatened injury is impending and concrete . . .  There must be some immediacy or imminence to the threatened injury." *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 68 (1st Cir. 2003) (emphasis added).  "Allegations of possible future injury do not satisfy the requirements of Art. III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  And a "subjective fear of injurious government action, even if that subjective fear is 'not fanciful, irrational, or clearly unreasonable,'" is also insufficient.  *Blum*, at 797 (quoting *Clapper* 133 S. Ct. at 1151).  The facts alleged must establish that the threatened injury is "certainly impending." *Clapper,* 133 S. Ct. at 1147; *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994) (to obtain preventive relief the injury must be "certainly impending").

The Declaratory Judgment Act, 28 U.S.C. § 2201, is not a means by which plaintiffs may avoid the necessity of establishing Article III standing.  Although complaints seeking declaratory judgments necessarily identify injuries which have yet to be experienced, relief under the Act is only available to the extent that the "case of actual controversy" at issue satisfies the requirements of Article III.  *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 240 (1937).  Thus, for the purpose of establishing Article III standing in the declaratory judgment context, the critical question "is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992).  This is a sensible test given that an alleged injury cannot be "certainly impending" if the events upon which the injury is predicated may not occur.

11

Finally, in order to establish a case or controversy where declaratory relief is sought pursuant to 42 U.S.C. § 1983, as here, plaintiffs must show both the existence of a federal constitutional or statutory right, and some certainly impending deprivation of that right, without due process of law, as a result of defendants' acting under color of state law. *Watterson*, 987 F.2d at 7.

> ### A. Plaintiffs Have No Constitutional Right to Make Medical Decisions Which Jeopardize N.T.'s Health and Safety, Nor a Right To Be Free From a § 51A Investigation.

As noted above, to successfully bring an action under § 1983, plaintiffs must show both the existence of a federal constitutional or statutory right, and some certainly impending deprivation of that right without due process of law. *Watterson*, 987 F.2d at 7; *Howard v. Malac*, 270 F.Supp. 2d 132, 139-140 (2003). The plaintiffs have failed to do so.

The Supreme Court has recognized an "abstract fundamental liberty interest in 'family integrity," of which the right to the care, custody and control of a child is a subset. *Hatch*, 274 F.3d at 20. However, a right to the care, custody and control of a child does not entitle parents to make any decision they so choose concerning the medical care of their child. *Parham v. J.R.,* 422 U.S. 584, 602-603 (1979) (parental rights do not include right to voluntarily admit minor child to mental hospital unless child and state's interests are protected by requiring "neutral and detached" physician to review parental decision); *Hatch,* 274 F.3d at 20 (the "law recognizes that the protection afforded to the parents' interest must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens"). Nor do parents enjoy a constitutional right to be free from child abuse and neglect investigations. *Watterson*, 987 F.2d at 7. And yet, it appears that these are precisely the rights plaintiffs seek to assert. Plaintiffs' requested declaration would effectively enjoin the

Department from taking any action which might impact plaintiffs' care, custody and control of

N.T., regardless of whether plaintiffs' decisions jeopardize N.T.'s physical or mental health.

    In sum, after setting aside plaintiffs' numerous allegations concerning the conduct of

non-party physicians, conclusory allegations that the Department is overly reliant upon

Children's Hospital, and irrelevant allegations concerning the Department's interactions with a

Connecticut family, the remaining facts, if proven, fail to establish the possible deprivation of

any constitutional or statutory right without due process of law. *See*, *Hodge v. Jones*, 31 F.3d

157, 164 (1994) (finding no familial privacy infringement where plaintiffs failed to demonstrate

that "Defendants actions were designed to have, have had, or even will have a significant impact

on the parent-child relationship or on their family's ability to function").

    **B.  Plaintiffs' Allegations, if Proven, Fail to Establish that a Deprivation of
        Plaintiffs' Constitutional Rights is Certainly Impending.**

    It is evident from the Complaint that plaintiffs have nothing more than a subjective fear

the Department will take some adverse action in response to decisions the plaintiffs may make in

the future concerning N.T.'s medical care.  Not only did the plaintiffs fail to allege that the

Department intended to take any action concerning N.T., there is also no indication, based on the

Department's past practice, that there is a certainly impending deprivation of plaintiffs'

constitutional right to the care, custody, and control of N.T.  Thus, plaintiffs have failed to satisfy

the Article III standing requirement.  *Clapper*, 133 S.Ct. at 1154 (finding no standing where

plaintiffs presented "no concrete evidence to substantiate their fears, but instead rest[ed] on mere

conjecture about possible government actions").

    "In assessing the risk of prosecution as to particular facts, weight must be given to the

lack of history of enforcement of the challenged statute to like facts." *Blum*, 744 F.3d at 798.

The Department has never, in the past, taken an "adverse action" against plaintiffs as a result of

plaintiffs' belief that N.T. has PANDAS; nor have the plaintiffs' alleged facts which demonstrate that the Department has, in the past, acted to deprive them of their right to the care, custody and control of N.T.  The Department took the following actions after receiving reports of abuse and neglect of N.T.:

   (1) the Department performed three § 51B investigations, as required by law;

   (2) one § 51B investigator consulted with a nurse employed by the Department and a consulting child psychiatrist, "to create an action plan to decrease further risk to this child," Compl., ¶ 64; and

   (3) one investigator asked the plaintiffs to identify a new pediatrician willing to oversee N.T.'s care and asked that the PANDAS physicians work together.  Compl., ¶ 65.

None of these actions, alone or together, are sufficient to establish that the Department's deprivation of plaintiffs' constitutional rights is certainly impending based on its past practice.

   First, the Department's investigation of the § 51A reports does not establish a history of acting to deprive plaintiffs of their constitutional right because they have no right to be free from a child abuse investigation.  *Watterson*, 987 F.2d at 8; *Howard,* 270 F.Supp. 2d at 138 (*accord*); *Wojcik v. Town of North Smithfield*, 874 F.Supp. 508, 519 (D.R.I. 1995) ("simple investigation, without more, . . . cannot possibly rise to the level of a constitutional violation").[6]

   Second, the investigator's decision to consult with Department staff and consulting psychiatrists in order to prepare a plan of action simply did not infringe upon plaintiffs' care, custody or control of N.T.  In fact, the investigator took the appropriate action of consulting with independent third-parties to ensure that individuals with medical training were presented with the information she had gathered.

---

[6] *See also*, *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994) (recognizing that constitutional right to family integrity does not include right to be free from child abuse investigations); *Kottmyer v. Maas,* 436 F.3d 684, 691 (6th Cir. 2006) (investigation into child abuse allegation "does not infringe upon a parent's right to custody or control of a child").

Third, plaintiffs' vague reference to the Department's "condition" of identifying a new pediatrician and having the PANDAS physicians communicate with one another also does not rise to the level of a deprivation of plaintiffs' right to the custody, care and control of N.T. Plaintiffs were certainly under no obligation to identify a new pediatrician or to insist that N.T.'s physicians communicate with one another.  Plaintiffs do not allege that, had they declined to do so, the Department would have taken some action which deprived them of their right to care, custody and control of N.T., absent due process of law.[7]

In sum, the Department has never concluded that the plaintiffs' opinion concerning the proper diagnosis for N.T. places her at risk.  In fact, the investigator expressly stated that plaintiffs were entitled to their opinion, regardless of the opinion of Children's Hospital.  Exhibit B, p. 13.  The Department supported N.T.'s participation in the Massachusetts General Hospital's PANDAS clinic.  Exhibit H, p.1.  The Department has also never concluded that the plaintiffs' decision to consult with multiple physicians at different facilities placed N.T. at risk. The investigator essentially applauded their efforts when she wrote:  "It appears the family has done everything in their power to try and find the right diagnosis and treatment for their daughter, to the point where they obtained  consultations with doctors outside of the state." Exhibit B, p. 13.  For these reasons, Count I should be dismissed because plaintiffs have failed to

---

[7]  Even if the Department had, as a result of the plaintiffs' refusal to cooperate, supported the § 51A allegation, "under Massachusetts law, parents can appeal abuse reports filed against them before a Hearing Officer, the Superior Court, the Appeals Court, and ultimately the Supreme Judicial Court; they may also seek direct appellate review from the Superior Court to the Supreme Judicial Court." *Howard v. Malac*, 270 F. Supp. 2d 132, 139-40 (D. Mass. 2003).  To the extent that plaintiffs are suggesting that the Department would have taken physical or legal custody of their child absent due process of law, such an allegation is completely lacking in support. State law provides parents with substantial procedural protections if the Department concludes such a revocation of rights is necessary to protect the health and safety of a child, including a right to counsel if the parents are indigent.  *See generally*, G.L. c. 119; *Custody of a Minor (No. 2),* 392 Mass. 719, 724 (1984); *In re Adoption of Olivia*, 53 Mass. App. Ct. 670, 674 (2002).

establish a certainly impending deprivation of a recognized constitutional right.

II.     **COUNT II SHOULD BE DISMISSED BECAUSE THE QUESTION PRESENTED IS MOOT AND THE COMMONWEALTH'S SOVEREIGN IMMUNITY PRECLUDES THE REQUESTED RELIEF.**

In Count II of the Complaint plaintiffs seek a declaration that because the Department

failed to promulgate a regulation concerning "medical child neglect," and took "adverse actions"

against them without a finding that they have abused or neglected N.T., the Department

unconstitutionally exceeded its statutory authority.  Compl., ¶ 96.  Count II therefore presents

this court with a claim that is not only moot, but is barred by the Commonwealth's sovereign

immunity from suit.  Count II must therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(1)

and 12(b)(6).

**A.  Count II of the Complaint Should be Dismissed As Moot.**

"Simply stated, a case is moot when the issues presented are no longer 'live' or the

parties lack a legally cognizable interest in the outcome."  *Am. Civil Liberties Union of*

*Massachusetts v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) (quoting

*D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54 (1st Cir. 1999) (internal quotation marks

omitted).  Here, because the Department has already concluded its investigation and closed the

matter with a finding of "no support," plaintiffs have no legally cognizable interest in the

outcome of this Court's consideration of whether the Department unconstitutionally exceeded its

statutory authority.  Any opinion with respect to Count II would be merely advisory and,

consequently, "Article III considerations require dismissal of the case."  *Id.*, (quoting *Mangual v.*

*Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003)); *Davidson v. Howe*, 749 F.3d 21, 26 (1st Cir.

2014) (*accord*).

### B.  The Commonwealth's Sovereign Immunity Bars the Entry of Declaratory Judgments Finding State Officers Violated Federal Law in the Past.

The relief that plaintiffs seek in Count II is barred by the Eleventh Amendment.  As a general matter, the doctrine of sovereign immunity — confirmed by, but not limited to the terms of, the Eleventh Amendment to the U.S. Constitution — bars suits in federal court against unconsenting states.  *Rosie D.*, 310 F.3d at 234.  It also bars official-capacity suits against state officials because "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  The one exception to this rule, announced in *Ex parte Young*, 209 U.S. 123 (1908), "allows federal courts . . . [to] enjoin state officials to conform *future* conduct to the requirements of federal law."  *Rosie D*., 310 F.3d at 234 (emphasis added).

But the *Ex parte Young* exception is a "narrow" one.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).  It permits suits against state officials in their official capacities for "prospective injunctive relief" only.  *Rosie D.,* 310 F.3d at 234; *Green v. Mansour*, 474 U.S. 64, 68 (1985) (*Ex parte Young* exception permits only "injunctive relief to prevent a continuing violation of federal law"); *Edelman v. Jordan*, 415 U.S. 651, 677 (1974) ("[A] federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief").  The exception "does not permit judgments against state officers declaring that they violated federal law in the past."  *Metcalf & Eddy*, 506 U.S. at 146.  Nor does it extend to any other "claims for retrospective relief."  *Green*, 474 U.S. at 68.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011)

(quotation marks and alterations omitted).  Plaintiffs satisfy neither aspect of this analysis.   First,

plaintiffs have not alleged an ongoing violation of federal law; nor could they do so because the

Department closed the case in December of 2013.  Second, Count II does not request relief that

is prospective but, rather, a declaration that while performing the § 51B investigations, the

Department violated the Constitution.  Such relief, which concerns allegations of past violations

of federal law, is barred by the Eleventh Amendment.

### III.   THE ATTORNEY GENERAL SHOULD BE DISMISSED FROM THE CASE BECAUSE PLAINTIFFS FAILED TO ALLEGE ANY FACTS WHICH STATE A CLAIM AGAINST THE ATTORNEY GENERAL.

Plaintiffs have named the Attorney General of the Commonwealth as a defendant in this

case, Compl., ¶ 15, but there is **not a single** factual allegation in the Complaint that concerns the

Attorney General.  Plaintiffs have therefore failed to satisfy the most basic pleading requirement

set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, which is that a complaint must

include a "short and plain statement of the claim showing the pleader is entitled to relief."  Fed.

R. Civ. P. 8(a)(2).  Needless to say, plaintiffs have also failed to submit a complaint which meets

the standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), where the Supreme Court stated

clearly that the "short and plain statement" requirement necessitates factual allegations that allow

"the court to draw the reasonable inference that the defendant is liable for the conduct alleged."

*Id*. at 677.  In this case, to satisfy this standard, plaintiffs needed to allege facts that would allow

the Court to infer the existence of a "certainly impending" threat that the Attorney General will

deprive them of their constitutional right to the care, custody, and control of N.T.  The Complaint

contains no such factual allegations or indeed any allegations concerning any action undertaken

by the Attorney General. Accordingly, the Attorney General should be dismissed from this case

pursuant to Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed, with prejudice.

> Respectfully submitted,
>
> ERIN DEVENEY, Interim Commissioner of the Department of Children and Families, and MARTHA COAKLEY, Attorney General of Massachusetts,
>
> By their attorneys,
>
>
> */s/ Suleyken D. Walker*
> Robert L. Quinan, BBO No. 553010
> robert.quinan@state.ma.us
> Suleyken D. Walker, BBO No. 654933
> suleyken.walker@state.ma.us
> Assistant Attorneys General
> One Ashburton Place
> Boston, Massachusetts 02108
>  (617) 727-2200

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that electronic (pdf) copies will be sent to those indicated as non-registered participants by e-mail on July 17, 2014.

> */s/ Suleyken D. Walker*
> Suleyken D. Walker
> Assistant Attorney General

July 17, 2014